233 N.J. Super. 441 (1989)
559 A.2d 424
JOHN DUBAK, JR., GENERAL ADMINISTRATOR OF THE ESTATE OF JOHN DUBAK, III, DECEASED, AND JOHN DUBAK, JR., ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF JOHN DUBAK, III, DECEASED, PLAINTIFF-RESPONDENT,
v.
BURDETTE TOMLIN MEMORIAL HOSPITAL, ET AL., and H. SEZER KOKNAR, M.D. AND STEWART & BROWN, P.A., and "Q" LOUNGE, INC., A CORP., A/K/A MARTINIQUE MOTEL AND "Q" LOUNGE, T/A MARTINIQUE CAFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1988.
Decided February 7, 1989.
*444 Before Judges DEIGHAN, BAIME and D'ANNUNZIO.
James P. Savio argued the cause for appellant "Q" Lounge (Savio, Reynolds & Drake, attorneys; Mr. Savio on the brief).
Joel B. Korin argued the cause for appellants H. Sezer Koknar, M.D. and Stewart & Brown, P.A. (George & Korin, attorneys; Dale Verfaillie Chant on the brief).
Carl D. Poplar argued the cause for respondent (Poplar & Florio, attorneys; John C. Eastlack, Jr. on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Plaintiff John Dubak, Jr., general administrator and administrator ad prosequendum of the estate of his deceased son, John Dubak III, instituted a wrongful death and survivorship action against Burdette Tomlin Memorial Hospital, H. Sezer Koknar, M.D., Sanford Fineman, M.D., James Menapace, M.D., Burdette Tomlin Emergency Group, Stewart & Brown, P.A., and Wildwood Rescue Unit, alleging medical malpractice in their treatment of the decedent. Plaintiff filed a second complaint against David Vitale, "Q" Lounge, Inc. and various officers and employees of the corporation, alleging that "Q" Lounge, Inc. failed to provide adequate security for its patrons and that Vitale committed an assault and battery upon the decedent. By order of November 18, 1985, the complaints were consolidated for purposes of trial on the issue of damages. Because the decedent's negligence, if any, could be considered in the suit against Vitale and "Q" Lounge but could not be assessed in the medical malpractice action, the cases were to be tried separately on the question of liability. Although the record is not altogether clear, it would appear that the latter aspect of this order, requiring separate trials as to liability, was *445 subsequently modified. It was agreed that all liability issues would be determined in the same trial, but that special interrogatories would be propounded to the jury permitting it to assign fault separately, corresponding to the named defendants in each complaint. Plaintiff's claims against various defendants were dismissed and the case proceeded against Vitale, "Q" Lounge, its officers and employees, and Dr. Koknar. Vitale subsequently defaulted.
Following a protracted trial, the jury awarded $250,305.54 in compensatory and punitive damages. Of this amount, Vitale was assessed $50,000 in exemplary damages. In its verdict, the jury determined in the medical malpractice action that Vitale was 70% at fault, "Q" Lounge was 20% negligent and Dr. Koknar was 10% negligent. In the action against "Q" Lounge and its officers and employees, the jury found that Vitale was 60% at fault, "Q" Lounge was 20% negligent and the decedent was 10% negligent. After the defendants' motions for a new trial were denied, the court molded the verdict and entered judgment accordingly.
The extensive record reveals the following essential facts. In the early morning hours of July 16, 1983, the decedent was involved in a physical altercation with Vitale at the Martinique Cafe, a popular discotheque, located in Wildwood, New Jersey. The decedent and his companions, Thomas Duffy, Lisa Sheehan and Joseph Hooven, were seated at a table when Duffy decided to approach the dance floor. As Duffy leaned against a pole observing the dancers, Vitale, who was seated at a nearby table with several other individuals, demanded that he refrain from blocking his view. When Duffy complied and returned to his table, the decedent walked to the dance floor and assumed a position near the pole. At this point, Vitale, who was much taller and heavier than the diminutive decedent, approached him, resulting initially in an exchange of words.
Although the exact chronology of events that followed is in dispute and remains somewhat unclear, it would appear that *446 Vitale jumped across a table and struck the decedent in the face. The decedent apparently swung at Vitale with a glass of beer, opening a wound in the latter's face. At trial, there was conflicting testimony concerning whether the decedent spit at Vitale and, if so, when this occurred.
In any event, several "bouncers" immediately intervened. One bouncer accompanied the decedent to the door, while another escorted Vitale to the bathroom in order to administer first aid. While in the bathroom, an enraged Vitale indicated that he intended to seek revenge. Once outside the bar, Vitale attacked the decedent, who apparently was waiting on the sidewalk for his companions. Again, the bouncers interceded, physically restraining Vitale. When they released him, however, Vitale again assaulted the decedent. After this engagement, the bouncers, while restraining Vitale, again ordered the decedent to leave.
The decedent, accompanied by Duffy and Sheehan, left the Martinique and walked toward the adjacent parking lot, which was owned by "Q" Lounge and was generally used by its patrons. As they reached the decedent's automobile, Vitale "came running at full sprint." Sheehan returned to the tavern, seeking the assistance of the bouncers. The final confrontation occurred in the parking lot, where Vitale tackled the decedent and repeatedly kicked him in the midsection as he lay on the ground. Again, the bouncers appeared and forcibly restrained Vitale.
At this point, a Wildwood police officer, who happened to be patrolling the area, was apprised of the incident by a pedestrian. Noticing that Vitale was bleeding from a facial wound, the officer placed him in the patrol vehicle. The decedent, who was standing among several on-lookers, then collapsed. The Wildwood Rescue Unit was immediately summoned and an ambulance reached the scene within minutes.
The decedent's initial complaint to the rescue squad personnel was that of abdominal pain. He was then placed in the ambulance *447 and transported to the Wildwood Clinic. After a brief stop, the rescue squad personnel were told to proceed to the Burdette Tomlin Memorial Hospital. The decedent lost consciousness upon arrival at the emergency room, where he was admitted at 1:07 a.m.
Emergency room treatment was initiated by Dr. Menapace, the emergency room physician, who, based on his examination, found indications of internal injuries. He immediately summoned Dr. Koknar, who arrived at approximately 1:15 a.m.
Determining that the decedent was suffering from shock, Dr. Koknar introduced large amounts of fluid intravenously and administered various medications. At 1:50 a.m., the physician performed a peritoneal tap to determine if blood was present in the abdominal cavity. It is undisputed that this test revealed a massive intraperitoneal hemorrhage. In his trial testimony, Dr. Koknar conceded that "all medical signs" and symptoms pointed in the direction of bleeding from internal organs. A blood transfusion was ordered at 2:15 a.m. and was first administered at 2:30 a.m. Four additional transfusions were administered before 3:45 a.m., at which time the decedent was taken to the operating room, where he died at 4:35 a.m.
Dr. Donald Jason, a forensic pathologist, determined that death was caused by "internal bleeding into the abdomen, hemoperitoneum due to laceration of the liver and contusion of the pancreas," which was the result of a "blunt force injury." Plaintiff's expert in general surgery, Dr. Saul Weinstein, testified that the laceration of the decedent's liver was reparable, i.e., that it could have been "easily handled by customary surgical techniques." He concluded that Dr. Koknar's care and treatment of the decedent fell below the accepted standard of medical practice. More specifically, he testified that the peritoneal tap, blood transfusions and the surgery should have been started earlier, and that the failure to do so constituted a substantial factor in causing the decedent's death. Stated somewhat differently, Dr. Weinstein was of the view that the *448 decedent died by reason of Dr. Koknar's "failure to expeditiously diagnose and vigorously treat these injuries." According to the witness, the decedent would have survived had surgery been performed earlier.
It is against this factual backdrop that we consider the arguments advanced by defendants. Although we consolidated the separate appeals filed by Dr. Koknar and "Q" Lounge, the issues presented are entirely different. We proceed initially with the contentions of Dr. Koknar and then consider the questions raised by "Q" Lounge.

I.
In accordance with plaintiff's request, the trial court provided the jury with alternative charges on the question of causation. In its instructions, the court stated that, in order to find liability, the jury must determine that Dr. Koknar's negligence was "an efficient cause of the incident, a cause which necessarily set the other causes in motion, [that it] was a substantial factor in bringing about ... the injuries complained of, ... a cause which naturally and probably led to and might have been expected to produce [the decedent's death.]" The court further instructed the jury that it could find Dr. Koknar liable if, alternatively, "his negligence, if any, increased the risk of death" and such enhanced risk constituted "a substantial factor in causing the decedent's death." In the special interrogatories propounded to the jury, these alternative theories of causation were correspondingly given. Counsel for Dr. Koknar interposed timely objections to both the court's instructions and the special interrogatory options given to the jury. In its verdict, the jury found that Dr. Koknar's negligence did not "naturally and probably" lead to the decedent's death, but that it created an "increased risk," constituting a "substantial factor" resulting in the decedent's demise.
Dr. Koknar argues on appeal that an "increased risk" charge should be given only in cases involving "complete nonfeasance." *449 Characterizing his negligence as "misfeasance," Dr. Koknar contends that the trial court's instruction on causation and proximate cause denied him a fair trial. He also argues that because the jury ascribed his negligence in terms of 10% of total fault, the increased risk resulting from his malpractice could not possibly have been considered a "substantial factor" in causing the decedent's death. We find no merit in these arguments.
Initially, we reject Dr. Koknar's contention that the trial court erred by instructing the jury that an "increased risk," resulting from malpractice, which constitutes a "substantial factor" in bringing about a result satisfies the element of causation. In Evers v. Dollinger, 95 N.J. 399 (1984), our Supreme Court held that, in the context of a claim of medical malpractice, when there is evidence that the defendant's negligence increased the risk of harm to the plaintiff and that the harm was in fact sustained, it becomes a jury question whether or not that increased risk constituted a substantial factor in producing the injury. Id. at 414-415. The Court reasoned that the difficulties of identifying, defining and proving injury in some malpractice cases justify the use of a "standard of causation that is more flexible than that used in conventional tort claims." Id. at 413. Relying on the Restatement (Second) of Torts, § 323(a) (1965)[1] and a series of Pennsylvania opinions, commencing with Hamil v. Bashline, 481 Pa. 256, 392 A.2d 1280 (1978) and culminating in Jones v. Montefiore Hosp. 494 Pa. 410, 431 A.2d 920 (1981), the Court opined that "[w]hen a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in [his] *450 mouth to raise conjectures as to the measure of the chances that he had put beyond the possibility of realization." 95 N.J. at 417, quoting Hicks v. United States, 368 F.2d 626, 632 (4th Cir.1966).
The holding in Evers v. Dollinger, supra, was followed in Hake v. Manchester Tp., 98 N.J. 302 (1985). There, the Court applied the "increased risk" theory of causation to a case involving a "lost chance of survival" where a police officer failed to take prompt measures to resuscitate a suicide victim. Id. at 312. The Court held that "[t]o make out a claim in this narrow class of cases of lost chance of survival, plaintiff[] ... need establish only that the defendants had a duty to save [the victim's] life and that there was a substantial possibility" of rescuing him from death. Id. at 311. Noting that "[t]he consequences of failure to make the effort are that it `obliterate[s] all possibility of evidence to prove whether a [rescue], if undertaken, would have succeeded or failed,'" the Court determined that a less onerous burden of establishing causation should be applied. Id. at 312, quoting Gardner v. National Bulk Carriers, Inc., 310 F.2d 284, 287 (4th Cir.1962), cert. den. 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963).
We have followed Evers v. Dollinger, supra, and Hake v. Manchester Tp., supra, in a variety of factual settings. See Scafidi v. Seiler, 225 N.J. Super. 576 (App.Div. 1988); Battista v. Olson, 213 N.J. Super. 137 (App.Div. 1986). See also Gaido v. Weiser, 227 N.J. Super. 175 (App.Div. 1988). Most recently, in Scafidi v. Seiler, supra, we said that where the evidence discloses a "downward medical course and an effort, allegedly negligent, to reverse or ameliorate it," proof that the risk of harm was increased by malpractice "is sufficient to create a jury question whether the increased risk was a substantial factor in producing the ultimate result." Id. 225 N.J. Super. at 582. There, we held that "the flexible Evers standard applies to all medical malpractice cases in which there is evidence that defendant's negligence increased the risk of the occurrence of the ultimate eventuating harm by failing to arrest plaintiff's *451 downward medical course." Ibid. In such cases, it was said that "it is a jury question whether the increased risk resulting from defendant's negligence was a substantial factor in producing the ultimate harm." Ibid.
These principles apply with equal force here. We recognize that the exact contours of the "increased risk" doctrine are not yet visible. We also acknowledge that another panel of this court has characterized the Battista and Hake cases as "stand[ing] generally for the proposition that in negligence actions predicated upon nonfeasance in lost chance of survival type situations it is for the jury to determine whether such nonfeasance was a `substantial factor contributing to the loss.'" Gaido v. Weiser, supra, 227 N.J. Super. at 200 quoting Hake v. Manchester Tp., supra, 98 N.J. at 311 (emphasis supplied). From this characterization, which appears in Judge Michel's majority opinion in Gaido v. Weiser, supra, Dr. Koknar contends that the "increased risk" theory does not apply in "misfeasance" cases. However, we do not perceive any particular utility in the misfeasance-nonfeasance distinction. Succinctly stated, it is a distinction without a difference, at least in the context of the facts present here.
One further matter deserves brief comment. As noted in our recital of the facts, Dr. Weinstein's testimony on causation and proximate cause satisfied the traditional "but for" standard. Dr. Koknar contends that because this traditional higher standard was met, the court should not have instructed the jury on the more flexible Evers "increased risk" standard. We perceive no merit in this argument. In our view, the otherwise appropriate Evers standard was applicable, as an alternative for the jury's consideration, even though plaintiff's witness attempted to exceed it. Stated somewhat differently, the rule applies "even if plaintiff's case includes evidence which would satisfy a higher standard." Scafidi v. Seiler, supra, 225 N.J. Super. at 582.
*452 We next consider whether the jury's finding, as set forth in its answers to the special interrogatories propounded, that Dr. Koknar was only 10% negligent is inconsistent with or impugns its conclusion that the increased risk caused by the malpractice committed constituted a "substantial factor" in producing the end result, the decedent's death. We reject this contention.
We are fully convinced that the jury's function of assessing relative percentages of fault is wholly distinct from its responsibility to determine questions relating to proximate cause and what constitutes a "substantial factor." In other words, the jury's determination of proximate cause bears no relation to its finding of relative fault. The following example best illustrates this fact. Ten drivers of automobiles, each horrendously intoxicated, converge and strike a pedestrian, causing his death. The jury determines that each driver was equally at fault, and thus ascribes 10% negligence to each defendant. In such a case, each driver's negligence or recklessness obviously constitutes a "substantial factor" in causing the pedestrian's death, notwithstanding the relatively small percentage of fault assigned to him.
In any event, even if Dr. Koknar were correct in treating "substantial factor" and the percentage of fault as equivalents, his argument would fare no better. In our view, 10% negligence can fairly be equated with a "substantial factor" causing the decedent's death. In short, we discern no merit in Dr. Koknar's argument.
In sum, our thorough review of the record convinces us that the trial court's instruction on the "increased risk" theory of causation did not constitute error and that the jury's findings fairly resolved the issue. We thus find no sound basis to reverse the judgment against Dr. Koknar.

II.
We now turn to the arguments advanced by "Q" Lounge. A full elucidation of the facts is necessary for a complete understanding *453 of the issues raised. Plaintiff's case against "Q" Lounge was predicated upon four separate but related theories. As disclosed by plaintiff's answers to interrogatories propounded in pretrial discovery and as revealed by the evidence presented at trial, it was claimed that "Q" Lounge was negligent by virtue of (1) its faulty hiring and training of its security personnel, (2) the bouncers' faulty decision in prematurely releasing Vitale while the decedent was still on its premises, (3) its failure to summon the police when it became apparent that Vitale would make further attempts to assault the decedent and (4) the unnecessarily violent measures used by the bouncers. At various stages of the trial the negligent hiring claim and the contention that that the bouncer's violent conduct caused the decedent's death were either abandoned by plaintiff or dismissed by the court for lack of evidence. We emphasize that the remaining theories, the premature release of Vitale and the failure of "Q" Lounge to summon the police, were the subject of substantial evidence and testimony presented by both parties. As we will describe more fully later in our opinion, these subjects were discussed in varying degrees in the opening and closing statements of counsel and were explored in considerable detail in the testimony presented.
Despite this incontestable and undisputed fact, plaintiff's attorney in his requests to charge submitted to the court prior to summations did not expressly allude to the contention that "Q" Lounge was negligent in failing to summon the police. Our examination of the requests to charge reveals that this thesis could perhaps have been considered to be subsumed in the proposed instructions on "Q" Lounge's general duty to provide adequate security for the benefit of its patrons, but no specific reference was made to the defendant's responsibility to summon the police.
Nor was this subject discussed during the pre-charge conference conducted prior to summations. We have difficulty understanding this strange silence, particularly so because the subject was so fully explored in plaintiff's examination of the *454 bouncers wherein repeated reference was made as to why the police were not summoned. In contrast, both counsel and the court made specific allusion to the contention that the bouncers had prematurely released Vitale in the face of the attendant danger to the decedent. The special interrogatories devised by the trial court with counsel's assistance referred only to the question of the negligence of the bouncers "with respect to the release of Vitale." No explicit reference was made in the interrogatories to plaintiff's related allegation that "Q" Lounge was negligent in failing to summon the police.
As starkly revealed by what subsequently transpired, the issue of whether "Q" Lounge was negligent because it failed to summon the police remained much in the minds of the jurors. In responding to the interrogatories, the jury found that none of the bouncers were negligent "with respect to the release of Vitale." However, in reply to the question "[w]ith respect to the last altercation what [percentage] of negligence [was] attributable" to "Q" Lounge and the bouncers, the jury found them to be 30% negligent. Because of this discrepancy, the jurors were individually polled and the answers to the special interrogatories were confirmed. Out of the presence of the jury, the trial court and counsel discussed the apparent inconsistency in the jury's responses.
Thereafter, the trial court explained the dilemma to the jury, noting that it had not found "Q" Lounge or the bouncers to be negligent but had assigned them 30% of the total fault. The jury was then asked to return to the jury room for further deliberations to determine "whether or not that inconsistency should stand." No objection was interposed by counsel with respect to this procedure.
The jury returned in short order. By written response to the trial court's question, the jury stated that all specific questions "referring to [the] bar and [the] bouncers" pertained to the "release of Vitale." In contrast, the interrogatory requesting the jury's response respecting the percentage of negligence *455 referred "to [the] last altercation." In this respect, the jury found that "Q" Lounge was 30% negligent by "no[t] call[ing] [the] police." At the request of counsel for "Q" Lounge, the trial court again summoned the jury and instructed it to determine whether the failure to call the police was a proximate cause of the decedent's injuries and subsequent death. In a written message, the jury responded unanimously in the affirmative.
"Q" Lounge now argues on appeal that the trial court's instructions to the jury to reconvene and explain the inconsistency between its answers was erroneous. It is argued that the trial court should have set aside the verdict and ordered a new trial. In a somewhat related contention, "Q" Lounge asserts that the jury's verdict was so unreliable as to compel reversal of the judgment. It is claimed that the jury embarked upon an unauthorized excursion uncharted by the court's instructions and that the result reached did not comport with the law.
Initially, we find no error in the procedure employed by the trial court in its attempt to determine the basis of the apparent inconsistency in the jury's original findings. The court's inquiry fully comported with the mandate of R. 4:39-2, which provides in pertinent part that "[w]hen the answers [to special interrogatories] are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial." By its very terms, the Rule confers substantial discretion on the trial court in deciding which course to choose. We perceive no abuse of discretion here. See, e.g., Turon v. J. & L. Construction Co., 8 N.J. 543, 552 (1952); J.M.B. Enterprises v. Atlantic Employers Insurance Company, 228 N.J. Super. 610, 616-617 (App.Div. 1988); 49 Prospect Street Tenants Assoc., et al. v. Sheva Gardens, Inc., et al., 227 N.J. Super. 449, 480-481 (App.Div. 1988). Roland v. Brunswick Corp., 215 N.J. Super. 240, 244 (App.Div. 1987); Bree v. Jalbert *456 v. Pacco Contr. Co., 91 N.J. Super. 38, 39-40 (App.Div. 1966); Bleeker v. Trickolo, 89 N.J. Super. 502, 508 (App.Div. 1965). Faced with the logical incongruity in the jury's original answers to interrogatories, the trial court was obliged to explain the difficulty and, upon proper supplemental instructions, to require it to reconsider its responses in light of the law. Roland v. Brunswick Corp., supra, 215 N.J. Super. at 244. The court's inquiry and the supplemental instructions given were entirely appropriate.
The second issue raised by "Q" Lounge is far more troublesome. We nevertheless have no hesitancy in concluding that the jury's verdict was reliable and not subject to impeachment or vitiation.
Clearly, this was not an error-free trial. Arguably, the trial court should have discussed during the charge conference the potential of including in its instructions plaintiff's claim that "Q" Lounge failed in its duty to summon the police. Only recently, our Supreme Court had occasion to reiterate the principle that "[a]ccurate and understandable jury instructions ... are essential to a ... fair trial" and that a judge "has an absolute duty to [charge] the jury on the law governing the facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988). The charge must provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." State v. Green, 86 N.J. 281, 287-288 (1981). See also Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-592 (1966). "Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, supra, 111 N.J. at 379. See also Schwarzer, "Communicating with Juries: Problems and Remedies," 69 Cal.L.Rev. 731, 741 (1981). As the trial judge readily conceded, his initial instructions to the jury, which referred to the general duty of a tavern to protect the security of its patrons and which alluded specifically only to the *457 question of the premature release of Vitale, failed in this essential endeavor.
We stress that there is fault enough to go around. Specifically, plaintiff's attorney failed to alert the trial judge to the problem. It is fundamental in our practice that counsel must, at least partially, bear the responsibility for insuring that his client's factual and legal contentions are properly placed before the jury. Cf. State v. Macon, 57 N.J. 325, 333 (1971). This duty takes on greater urgency when, as here, the trial is protracted and the legal issues raised are numerous and complex. In such a situation, we cannot fairly expect trial judges to sift meticulously through the record to determine whether the facts, either in combination or singly, require submission of a question to the jury. As we have pointed out, that duty is cast, at least originally, on the shoulders of counsel.
We hasten to add that this case was otherwise well-tried by both the court and counsel. We merely note these prefatory comments because the question presented to us is somewhat unusual. Specifically, the issue raised is whether a jury's verdict, which is supported by ample evidence, can withstand attack where the theory upon which the jury decided the case was not included in the court's instructions. In the context of the facts presented here, we find no warrant for vitiating the jury's verdict.
We commence our analysis with the well-settled principle that the proprietor of premises to which the public is invited for business purposes owes a duty of reasonable care to those who enter the establishment "to provide a reasonably safe place to do that which is within the scope of the invitation." Butler v. Acme Markets, Inc., 89 N.J. 270, 275-276 (1982). See also Brody v. Albert Lifson & Sons, 17 N.J. 383, 389 (1955); Genovay v. Fox, 50 N.J. Super. 538, 549 (App.Div. 1958), rev'd on other grounds 29 N.J. 436 (1959); Chomatopoulos v. Roma DeNotte Social Club, 212 N.J. Super. 447, 450 (Law Div. 1985). Cf. Trentacost v. Brussel, 82 N.J. 214, 228 (1980). The measure *458 of that care has been described as "due care under all the circumstances." Bozza v. Vornado, Inc., 42 N.J. 355, 359 (1964). See also 2 Harper & James, Law of Torts, § 27.12, p. 1487 (1956). "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." Rappaport v. Nichols, 31 N.J. 188, 201 (1959). If the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability. Butler v. Acme Markets, Inc., supra, 89 N.J. at 276; Hill v. Yaskin, 75 N.J. 139, 143-145 (1977); Zinck v. Whelan, 120 N.J. Super. 432, 445 (App.Div. 1972); Picco v. Fords Diner, Inc., 113 N.J. Super. 465, 467 (App.Div. 1971). Foreseeability of the risk that criminal acts of others would cause harm "is the crucial factor." McGlynn v. Newark Parking Authority, 86 N.J. 551, 560 (1981).
These principles have their genesis in our case law and, as to taverns and bars, are presently codified in N.J.A.C. 13:2-23.6. That regulation provides in pertinent part that "[n]o licensee shall engage in or allow, permit or suffer in or upon the licensed premises [a]ny harm, act of violence [or] disturbance." This regulation, which was read to the jury in the course of the court's instructions, provides a minimum standard of safety and has the "force of law." Trentacost v. Brussel, supra, 82 N.J. at 230.
Although our research has disclosed no reported New Jersey decision dealing with the precise issue, we are convinced that, under certain circumstances, a tavern owner is duty-bound to summon the police when it is reasonably foreseeable that a patron may otherwise be harmed by the criminal acts of another. In our view, reasonable care in the context of such a threat embraces the duty to seek police assistance to prevent injury to the tavern owner's patrons. Other jurisdictions have held that "those in charge of a business establishment if time allows," *459 are obliged to contact the police "in the event of a disturbance in order to prevent injury to patrons." Anderson v. Clements, 284 So.2d 341, 344 (La. App. 4 Cir.1973). See also Toups v. Hawkins, 518 So.2d 1077, 1081 (La. App. 5 Cir.1987); Holdsworth v. Renegades of Louisiana, Inc., 516 So.2d 1299, 1301 (La. App. 2 Cir.1988), certif. den. 519 So.2d 126 (1987); Getson v. Edifice Lounge, Inc., 117 Ill. App.3d 707, 711-712, 72 Ill.Dec. 826, 830, 453 N.E.2d 131, 134 (Ill. App. 3rd Dist. 1983); Borne v. Bourg, 327 So.2d 607, 610 (La. App. 4 Cir.1976); Shank v. Riker Restaurants Associates, Inc., 28 Misc.2d 835, 216 N.Y.S.2d 118, 120 (Special Term New York County 1961), aff'd 15 A.D.2d 458, 222 N.Y.S.2d 683 (1st Dept.App.Div. 1961). Such a duty rests upon the foreseeability of the risk of criminal acts by others and the opportunity of the tavern owner to summon the police. See, e.g., Taylor v. Gerry's Ridgewood, Inc., 141 Ill. App.3d 780, 782-84, 95 Ill.Dec. 895, 898, 490 N.E.2d 987, 990 (Ill. App.3d Dist. 1986). In any event, we need not dwell upon the subject. "Q" Lounge does not challenge the principle that a tavern owner owes the duty to seek police assistance when it is reasonably foreseeable that such a measure is necessary to avert harm to a patron by reason of another's criminal acts.
The only remaining question, therefore, is whether the jury's verdict, which clearly rested upon these principles, must be set aside because the trial court's instructions and the special interrogatories propounded did not specifically and expressly set forth this theory of liability. We are convinced that, despite this omission, the jury's verdict was entirely reliable. As we have repeatedly emphasized, this theory, the failure of "Q" Lounge to summon the police, was consistently advanced by plaintiff from the commencement of the suit to the conclusion of the trial. We have alluded previously to the fact that plaintiff specifically presented this contention in his answers to interrogatories propounded by "Q" Lounge in pretrial discovery. As we have pointed out, the subject was discussed in the course of the parties' opening statements. The record reflects that much of the evidence presented at trial focused *460 upon the issue why the police were not summoned. And finally, the matter was extensively reviewed by counsel for "Q" Lounge during his summation. This latter point is particularly significant, because it belies "Q" Lounge's present contention that its attorney did not anticipate this issue in his closing statement. The short answer to this argument is that defense counsel devoted considerable attention to the subject in his summation, indeed considerably more so than plaintiff's attorney.
We come then to an old topic  one upon which reasonable persons often differ  the ability of the jury to find the facts and do justice in light of the evidence. It has been said that courts "are ambivalent in their estimate of the intelligence of the layman, summoning one line of cases and then another to support the varying moods of their decisions." State v. Hawthorne, 49 N.J. 130, 147 (1967) (Weintraub, C.J., concurring). To some, resolution of that question depends upon "whether one views the jury as composed of twelve [persons] of average intelligence or twelve [persons] of average ignorance." Note, 35 Brooklyn Law Rev. 139, 140 (1968). Whatever else may be said, it is clear that the jury in this case was unusually astute and perceptive. We find no justifiable reason to set aside the verdict in the circumstances of this case.

III.
"Q" Lounge next contends that the trial court erred by refusing to allow the jury to consider the decedent's actions inside the tavern in determining the extent of his negligence. The issue presented must be considered in the context of the following facts. At the conclusion of the trial, plaintiff contended that the decedent's conduct prior to the confrontations outside the bar was irrelevant to a determination of the comparative fault of the parties. The trial court apparently agreed on the basis that the only negligent act alleged against "Q" Lounge pertained to the failure of the bouncers to protect the *461 decedent from attack once he had left the tavern. "Q" Lounge contends that the trial court's decision unrealistically fractionalized the events leading up to the decedent's death and prevented the jury from fairly considering the "entire picture."
We agree that a plaintiff's conduct antecedent to the defendant's alleged negligent act can have a bearing on the issue of comparative fault to the extent that it contributed to the cause of the incident or to the extent of the injuries sustained. Cf. Waterson v. General Motors Corp., 111 N.J. 238, 275 (1988). In this respect, we know of no jurisprudential requirement that only the simultaneous acts of the parties are to be considered in assessing comparative fault.
This much conceded, we are convinced that the trial court's unduly restrictive view of the issue did not deprive "Q" Lounge of a fair trial. At the precharge conference, the court expressly stated that defense counsel had the "right to comment upon the origin" of the final confrontation and this included the right to refer to what transpired inside the tavern. The attorney for "Q" Lounge fully availed himself of this opportunity. Much of his summation concerned the decedent's belligerent acts in allegedly instigating the original altercation and provoking Vitale.
Moreover, the trial court's instructions placed no limitation on the jury's right to consider the decedent's acts in the tavern in determining comparative fault. The jury was told that it had the right and obligation to consider plaintiff's conduct in assessing relative fault. A plain reading of the charge reveals that the court did not specifically or impliedly state to the jury what acts of the decedent it could or could not consider in reaching its decision as to the question of comparative fault. In sum, we perceive no prejudice whatever resulting from the court's expressed but unexecuted intention to restrict the jury's consideration of comparative negligence to the circumstances surrounding the final confrontation.

*462 IV.
"Q" Lounge's final contention is that the trial court erred by refusing to charge the jury concerning Vitale's alleged violation of the manslaughter statute (N.J.S.A. 2C:11-4). We find no merit in this argument.
We recognize that violation of a statute may generally be considered by a jury in determining issues of negligence or contributory negligence. See, e.g., Braitman v. Overlook Terrace Corp., 68 N.J. 368, 385 (1975); Horbal v. McNeil, 66 N.J. 99, 103-104 (1974); Ellis v. Caprice, 96 N.J. Super. 539, 553 (App.Div. 1967), certif. den. 50 N.J. 409 (1967); Mattero v. Silverman, 71 N.J. Super. 1, 9 (App.Div. 1961), certif. den. 36 N.J. 305 (1962). However, "this rule is subsumed by the overriding principle that the statutory violation, to be evidential, must be causally related to the happening of the accident, since a permissible inference of causality is indispensable to its relevancy." Mattero v. Silverman, supra, 71 N.J. Super. at 9. We perceive no such causality and thus no direct relevancy here.
Even assuming, however, that the trial court erred by refusing to charge the jury on the alleged violation of the manslaughter statute,[2] we would not reverse on this basis. Vitale's misconduct, whether or not violative of N.J.S.A. 2C:11-4, was conceded by all parties. Indeed, both plaintiff and "Q" Lounge emphasized the vicious and brutal nature of Vitale's attack upon the decedent. We discern no error capable of producing an unjust verdict.

V.
Accordingly, the judgment of the Law Division in favor of plaintiff against Dr. Koknar and "Q" Lounge is affirmed.
NOTES
[1] Section 323(a) provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increased the risk of such harm ...
[2] Vitale was later tried and acquitted of manslaughter.