247 N.J. Super. 538 (1991)
589 A.2d 1059
DARLEEN BATTENFELD AND PAUL BATTENFELD, PLAINTIFFS-RESPONDENTS,
v.
THOMAS V. GREGORY, M.D., JAMES J. TABASSO, M.D., ATLANTIC OB/GYN GROUP, P.A., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 1991.
Decided May 2, 1991.
*541 Before Judges DEIGHAN, BAIME and ARNOLD M. STEIN.
Robert E. Paarz argued the cause for appellants (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys; Robert E. Paarz on the brief).
Blanca I. Rodriguez argued the cause for respondents (Kreindler & Kreindler, attorneys; Francis G. Fleming and Noah H. Kushlefsky on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Plaintiff Darleen Battenfeld instituted this action against her obstetricians defendants Thomas Gregory and James Tabasso, claiming that they were negligent in failing to diagnose her infectious ruptured appendix in a timely fashion. Plaintiff claimed that the delay in surgically removing her appendix resulted in severe pelvic adhesions and the consequent loss of fertility. Following a lengthy trial, the jury found both physicians negligent and awarded plaintiff $246,400 and her husband $24,640 on his per quod claim. We find substantial errors in the trial court's charge and thus reverse the judgment.

I.
Because the issues raised on this appeal concern solely the trial court's jury instructions, we need not recount the facts at length. Plaintiff became pregnant in 1984 and came under the *542 care of defendants, who specialize in obstetrics and gynecology. Defendants had previously treated plaintiff during her earlier successful pregnancy.
On December 18, 1984, plaintiff, who was then approximately five months pregnant, began experiencing severe nausea, vomiting and diarrhea. She immediately contacted defendants' office and was told by a receptionist to take an over-the-counter drug. On December 20, plaintiff began experiencing sharp abdominal pains. Plaintiff was taken to a nearby Coast Guard base clinic where she was examined by a medical officer. Recognizing that plaintiff was very ill, the physician contacted Dr. Gregory who agreed to meet her at the Shore Memorial Hospital.
Shortly thereafter, plaintiff was examined in the emergency room by Dr. Gregory and Dr. George Robb, a consulting surgeon, and was admitted to the maternity ward. At approximately 10:30 p.m., plaintiff began to miscarry. Dr. Gregory was present with plaintiff in the labor room, but left to change his clothes after her "water broke." He was not present when the fetus and placenta were delivered. These were sent to the pathology department for evaluation. A pathology report was later prepared, indicating that "[t]he placenta appears incomplete" and a "[c]linical correlation is suggested."
Plaintiff's symptoms greatly improved over the next 48 hours. At approximately 9:00 a.m. on December 22, she was seen by Dr. Tabasso. During the visit, plaintiff noted that she was feeling much better and wanted to go home to be with her family. Dr. Tabasso recommended that she remain in the hospital until her temperature was normal for 24 hours. He volunteered, however, that she could "sign herself out" of the hospital if she executed a form acknowledging that she was leaving "against medical advice." At trial, plaintiff testified that she would have remained in the hospital had she known that her temperature, elevated white blood cell count and rapid pulse were suggestive of a serious underlying infection. Dr. *543 Tabasso allegedly failed to apprise her of this information and she therefore executed the release and discharged herself from the hospital.
Plaintiff remained at home for the next five days. However, on December 27, Dr. Gregory, having reviewed plaintiff's file and noting her elevated white blood count, directed her to come to his office immediately. On the doctor's advice, plaintiff was readmitted to the hospital where a dilation and curettage was performed. Her condition deteriorated markedly on December 28 and 29. On December 31, the doctor performed an exploratory laparotomy, expecting to find an infection in plaintiff's reproductive system. Instead, the surgery revealed a ruptured appendix, which was then removed. According to the doctors, the appendix was retrocecal, i.e., situated behind the cecum and slightly displaced from its normal location in the body.
After recovering from the surgery, plaintiff was discharged on January 5, 1985. Although her recovery initially appeared to be complete, plaintiff's attempts to have additional children were unsuccessful. At trial, plaintiff contended that her reproductive organs were permanently damaged by defendants' failure to timely diagnose and remove her ruptured appendix. In support of this theory, plaintiff's expert testified that defendants' negligence allowed the ruptured appendix to fester for some 11 days. According to the witness, "the longer an inflammatory process is [permitted] to dwell within the abdomen," the greater the body responds by developing adhesions. According to Dr. Edwin Jones of the Yale Fertility Clinic, the extensive scarring that resulted did not prevent ovulation or conception, but instead precluded a fertilized egg from implanting in the womb, resulting in infertility.
Defendants denied that they were negligent in failing to timely diagnose plaintiff's condition. They urged that because the appendix was displaced from its normal location, the natural and reasonable assumption was that plaintiff's symptoms related to an underlying problem with her reproductive system. *544 Defendants also claimed that plaintiff's infertility was the result of hormonal and ovulation problems unrelated to the pelvic adhesions.
In formulating its instructions, the trial court essentially accepted plaintiff's theory that defendants' negligence created an increased risk of harm flowing from her preexistent appendicitis condition and was a substantial factor in producing the ultimate result. However, the court also agreed with defendants' argument that both the "substantial factor" and more stringent "but for" theories of proximate cause were applicable. Moreover, the court, over the vigorous objection of both attorneys, determined that the concept of "substantial factor" required clarification, necessitating a definition encompassing percentage quantifications. Because defendants' arguments relate to the instructions given, we quote verbatim from substantial portions of the charge:
Plaintiffs further contend that this negligence increased the risk of injury to Darleen. By that I mean that defendants' negligence increased the risk of ultimate injury from above the level of risk, which would have resulted from non-negligent treatment. They contend further that this increased risk was a substantial factor in causing her infertility for which disability and pain and suffering she seeks money damages at your hands.
Now, the defendants deny they were negligent. They deny there was any increased risk to plaintiff or that any of their actions or inactions were a substantial factor in bringing about plaintiff's infertility or resulted in any additional pain, suffering, disability or damages to plaintiff. Therefore, in this case initially, the plaintiff must show that first, the defendants' action or inaction led to a delay in diagnosis and operation by December 22, and that this was a substantial  this was a deviation from accepted medical practice and if their activity or inactivity was not a deviation, then the defendants were not negligent. That's the first evaluation you have to make. Was there negligence and you determine that based upon whether or not there was a deviation from accepted medical standards in the practice. If their action or inaction by December 22 [was] a deviation from accepted medical practice, then defendants were negligent, as I said, and in that event you must determine if this negligence increased the risk of infertility to the plaintiff. If this did not increase the risk of infertility, there can be no recovery. If it did, you must then determine if that increased risk was a substantial factor in producing plaintiff's infertility. If the increased risk was not a substantial factor in causing infertility, there can be no recovery, but if it was a substantial factor, *545 plaintiffs will be entitled to recover for those damages approximately resulting from their activity or inactivity.
* * * * * * * *
Now, there are different kinds of burdens of proof in this and I hope I can make you understand the difference between them. It is plaintiff's burden of proof to show her disability; that is, her infertility resulted from an increased risk created by a defendant or defendants' negligence which increased risk was a substantial factor in causing the infertility. However, the resultant damages arising from the increased risks substantial factor process must be proximately caused by this process.
By proximate cause I mean that the negligent process [which] was a substantial factor in causing the damages to plaintiffs defines a cause which has naturally and properly led to and might have been expected to produce the injuries and damages claimed. Plaintiffs must show that the injury, for which they seek compensation, was a natural and probable result of the negligent process and it isn't enough to prove mere possibility of a particular claim, an item of damage was caused by the negligent process. Speculation isn't enough. It must be shown that there was a natural and probable consequence of this negligent process.
Let me  I think the best way to demonstrate the difference between proximate cause and substantial factor is, proximate cause is something more than 50%. Substantial factor is something less than 51%. It's not as great. Burden of proof in establishing substantial factor is less than the burden of proof in establishing proximate cause. And so, a proximate cause must be a cause which was at least 51%  or 51% or more responsible for that event.
Substantial factor is something as I said, something less than 51% and also advise you that it must be more than 9%. You have that range of percentages and I hope that helps to explain to you what the difference is in the burden of proof under those circumstances.
Now, I've prepared a list of questions for you, which, when you have answered those questions, which you determine in accordance with my instruction you should answer, you will arrive at your verdict in this case.
While not originally encompassed in the pretrial order, the court also decided to instruct the jury on the theory of informed consent. As framed by the court, one of the questions presented by the evidence was whether Dr. Tabasso was negligent in failing to inform plaintiff of the risks in discharging herself from the hospital contrary to his advice. According to the court, the issue focused upon whether the doctor provided plaintiff with sufficient information to enable her to make an informed decision on what course to choose.
*546 In its verdict, the jury found that Dr. Gregory was negligent in failing to diagnose plaintiff's condition, that his negligence increased the risk of harm, and that it was a substantial factor in causing the patient's infertility. The jury also found that Dr. Tabasso was negligent in not providing plaintiff with sufficient information, that his negligence increased the risk of harm, and that it was a substantial factor in causing the patient's infertility. The jury allocated comparative fault by finding plaintiff 20% negligent, Dr. Gregory 50% and Dr. Tabasso 30%.
On appeal, defendants argue that the trial court committed reversible error in its jury instructions by (1) purporting to quantify the concept of substantial factor in percentage terms, (2) referring to both the "substantial factor" and "but for" standards of proximate cause, and (3) permitting recovery against Dr. Tabasso on the basis of informed consent liability. We will consider defendants' contentions seriatim.

II.
We first address defendants' argument that the trial court erred in its attempt to define substantial factor in terms of percentages. As we noted previously, both parties vigorously objected to the court's instruction that substantial factor was "something less than 51% ... and more than 9%." We are convinced that the concept of substantial factor is not subject to quantification and that the trial court's charge on the subject was error capable of producing an unjust result.
In a series of cases, our Supreme Court has held that in the context of medical malpractice, when there is evidence that the defendant's negligence increased the risk of harm to the plaintiff and that the harm was in fact sustained, it becomes a jury question whether or not that increased risk constituted a substantial factor in producing the injury. Scafidi v. Seiler, 119 N.J. 93, 102-104, 574 A.2d 398 (1990); Evers v. Dollinger, 95 N.J. 399, 414-415, 471 A.2d 405 (1984); cf. Olah v. Slobodian, 119 N.J. 119, 574 A.2d 411 (1990). The Court reasoned that the *547 difficulties of identifying, defining and proving injury in some malpractice cases justify the use "of a standard of causation that is more flexible than that used in conventional tort claims." Evers v. Dollinger, 95 N.J. at 413, 471 A.2d 405. This flexible standard apparently applies to all medical malpractice cases in which there is evidence that the defendant's negligence increased the risk of the occurrence of the ultimate eventuating harm by failing to arrest the patient's downward medical course. This approach reflects the emerging pattern of decisions on this issue in other jurisdictions and has also been the subject of scholarly comment. See, e.g., Keir v. United States, 853 F.2d 398, 415-417 (6th Cir.1988); Daniels v. Hadley Memorial Hosp., 566 F.2d 749, 753 (D.C. Cir.1977); Thompson v. Sun City Community Hosp., Inc., 141 Ariz. 597, 688 P.2d 605, 613-616 (1984); Northern Trust Co. v. Louis A. Weiss Memorial Hosp., 143 Ill. App.3d 479, 97 Ill.Dec. 524, 529-30, 493 N.E.2d 6, 11-12 (1986); Aasheim v. Humberger, 215 Mont. 127, 695 P.2d 824, 828 (1985); Herskovits v. Group Health Co-Op., 99 Wash.2d 609, 664 P.2d 474, 477 (1983); Annotation, Medical Malpractice: "Loss of Chance" Causality, 54 A.L.R.4th 10 (1987); see also Prosser and Keeton on Torts, § 41 at 263 (5th ed. 1984); King, Causation, Valuation and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353 (1981).
The substantial factor test of causation requires the jury to determine whether the deviation, in the context of the patient's preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause. Scafidi v. Seiler, 119 N.J. at 109, 574 A.2d 398; see also Brown v. United States Stove Co., 98 N.J. 155, 484 A.2d 1234 (1984). In Evers v. Dollinger, 95 N.J. at 406, 471 A.2d 405, our Supreme Court observed that the increase in risk resulting from the negligent act is "unquantifiable." Similarly, in Dubak v. Burdette Tomlin Memorial Hosp., 233 N.J. Super. 441, 559 A.2d 424 (App.Div. 1989), we said that the jury's function of assessing relative percentages of fault is wholly *548 distinct from its responsibility to determine questions relating to proximate cause and what constitutes a "substantial factor." Id. at 452, 559 A.2d 424. We are satisfied that the phrase "substantial factor" is sufficiently intelligible to furnish adequate guidance and instruction to the jury and that it is neither possible nor desirable to reduce it to percentage terms. See Prosser and Keeton on Torts, § 41 at 267. We also find that the trial court's error in attempting to quantify "substantial factor" deprived defendants of their right to a fair trial. Contrary to the confusing message conveyed by the trial court in its instructions, the substantial factor test does not diminish the plaintiff's burden of proof. While the substantial factor test is less stringent than the "all or nothing" "but for" standard, it does not alter the plaintiff's burden of proving liability. King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Condition and Future Consequences, 90 Yale L.J. at 1366 n. 41. Nor does it reduce or lessen the plaintiff's standard of proof, i.e., by a preponderance of the evidence. The impact of the trial court's error was to dilute the plaintiff's burden and standard of establishing the elements of her cause of action. We, therefore, reverse.

III.
Because the matter must be retried, we address defendants' remaining arguments. We first consider defendants' claim that the trial court erroneously instructed the jury on both the "but for" and "substantial factor" theories of proximate cause. We agree that the Scafidi and Evers charge delivered in conjunction with the traditional "but for" proximate cause standard has the potential for confusing the jury. We note, however, that it was the defendants, not the plaintiff, who requested the trial court to instruct the jury on both standards. Because the error was induced by defendants and the charge as given was overly favorable to them, we would not reverse on this basis. See State v. Corsaro, 107 N.J. 339, *549 345-346, 526 A.2d 1046 (1987). Since the issue may arise at the retrial, we offer the following comments for guidance.
The modified standard of proximate causation, substantial factor, is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm  as distinguished from cases in which the deviation alone is the cause of harm. Scafidi v. Seiler, 119 N.J. at 108-109, 574 A.2d 398. The jury is first asked whether, as a matter of reasonable medical probability, the physician's negligence increased the patient's risk of harm flowing from the underlying disease or injury. Id. at 109, 574 A.2d 398. Assuming the jury makes this finding, "we use the `substantial factor' test of causation because of the inapplicability of `but for' causation to cases where the harm is produced by concurrent causes." Ibid. The substantial factor standard is more lenient than the traditional "but for" test of causation. The stricter "but for" standard requires proof that the defendant's failure to treat the preexistent condition "was a probable cause of the resultant injury." Id. at 107, 574 A.2d 398. (Emphasis in original). In contrast, the "substantial factor" test requires only that the physician's deviation, in the context of the preexistent condition, "was sufficiently significant in relation to the eventual harm [as] to satisfy the requirement of proximate cause." Id. at 109, 574 A.2d 398. It is self-evident that in cases in which defendant's negligence combines with a preexistent condition, the standard charge on proximate cause could confuse or mislead the jury. Id. at 102, 574 A.2d 398. In such a case, it is error to instruct the jury on the "but for" proximate cause test either alone or in combination with the substantial factor standard.
Defendants contend that there may arise cases in which the damages or injuries sustained by the plaintiff are too remote to permit recovery. They argue that in such a situation, the jury should be charged on both proximate cause standards. We recognize that there may be cases in which the harm to the *550 plaintiff is so attenuated or distant from the negligent act that a more stringent standard of legal cause may perhaps be applicable. As noted by Dean Prosser, "[i]n a philosophical sense, the consequences of an act go forward to eternity" and "[s]ome boundary must be set to liability ... upon the basis of some social idea of justice or policy." Prosser and Keeton on Torts, § 41 at 264. As a practical matter, there must be some convenient clamp or restriction placed upon a tortfeasor's otherwise boundless liability. Gautam v. De Luca, 215 N.J. Super. 388, 399, 521 A.2d 1343 (App.Div. 1987). We need not dwell upon the subject. Suffice it to say, none of the injuries or damages claimed by plaintiff in this case is so remote, extraordinary or distant as to compel application of a more stringent standard of proximate cause. We leave for another day the question of whether a stricter standard should be applied to arguably remote or, for want of a better term, "second tier" injuries.

IV.
Defendants' final argument is that the trial court should not have instructed the jury on informed consent. They assert that the issue of informed consent was not set forth in the pretrial order but rather was injected into the trial by the court. Defendants further claim that the informed consent doctrine is not applicable to a patient's refusal to abide by her physician's recommended course of treatment. In light of the result we have reached, we need not address defendants' procedural argument that the trial court erroneously amended the pretrial order. We are convinced, however, that a physician may be held liable for withholding information concerning the potential harm likely to result if the patient remains untreated.
Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to consider and weigh knowledgeably the options available and the risk attendant to each. Perna v. Pirozzi, 92 *551 N.J. 446, 459, 457 A.2d 431 (1983). Under the doctrine, the patient who consents to an operation is given the opportunity to show that the physician withheld information concerning the inherent and potential hazards of the proposed treatment, the alternatives, if any, and the results likely if the patient refuses the prescribed course. Id. at 460, 457 A.2d 431. The breadth of the disclosure of the risks legally required is measured by a standard whose scope is "not subjective as to either the physician or the patient." Largey v. Rothman, 110 N.J. 204, 211, 540 A.2d 504 (1988), quoting Canterbury v. Spence, 464 F.2d 772, 787 (D.C. Cir.1972), cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). It remains objective with due regard to the patient's needs and with suitable leeway for the physician's situation. Ibid. The test for determining "whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked." Id. 110 N.J. at 211, 540 A.2d 504, quoting Canterbury, 464 F.2d at 786-787. "A risk would be deemed `material' when a reasonable patient, in what the physician knows or should know to be the patient's position, would be `likely to attach significance to the risk or cluster of risks' in deciding whether to forego the proposed therapy or to submit to it." Ibid.
The informed consent doctrine has generally been applied in cases in which the patient has undergone the treatment proposed by the physician. At issue here is the informational needs of a patient who declines the treatment recommended by the doctor. However, both situations involve the right of a person to control his own body, "a basic societal concept." In re Conroy, 98 N.J. 321, 346, 486 A.2d 1209 (1985). In its decisions concerning the right of the terminally ill to renounce life-sustaining treatment, our Supreme Court has recognized the patient's right to give an "informed refusal" to medical treatment as the legal correlative of the right to give informed consent. Id. at 347, 486 A.2d 1209. See also In re Farrell, 108 N.J. 335, 347-348, 529 A.2d 404 (1987); In re Peter by Johanning, *552 108 N.J. 365, 372, 529 A.2d 419 (1987); In re Jobes, 108 N.J. 394, 407, 529 A.2d 434 (1987); In re Quinlan, 70 N.J. 10, 41, 355 A.2d 647 (1976), cert. den. sub nom., Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). However phrased, we are convinced that a doctor owes the duty to his patient to apprise him of the potential hazards of refusing the recommended treatment. The doctor's duty of disclosure is to be measured by the "prudent patient" or "materiality of risk" standard adopted by our Supreme Court in Largey v. Rothman, 110 N.J. at 212, 540 A.2d 504.
Depending upon the evidence elicited at the retrial, the trial court is to instruct the jury on informed consent. As we understand plaintiff's claim, she asserts that the doctors would have made a more timely diagnosis of her condition had she remained in the hospital. She contends that Dr. Tabasso failed to fully disclose the hazards and risks inherent in her refusal to submit to the recommended course of treatment. These are factual issues to be decided by the jury.
The judgment of the Law Division is reversed and the matter is remanded for a new trial.