**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2611-18T1

KYLIE TAPIA, an infant by her
Guardian ad Litem MARIA TAPIA,
and MARIA TAPIA and OCTAVIO
TAPIA, Individually,

     Plaintiffs-Respondents,

v.

ABU S. ALAM, MD, ABU S.
ALAM, PA, RICHARD H.
BLUM, MD, ATLANTIC
MATERNAL-FETAL MEDICINE
AT OVERLOOK MEDICAL
CENTER, ATLANTIC HEALTH
SYSTEM, and SVETLANA
PORTNOW, RDMS,

     Defendants,

 and

GARRY FRISOLI, MD,

     Defendant-Appellant.

_____

Argued February 11, 2020 – Decided September 28, 2020

Before Judges Hoffman, Currier, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-0694-15.

Beth A. Hardy argued the cause for appellant (Farkas & Donohue, LLC, attorneys; Beth A. Hardy, of counsel and on the briefs).

Dennis M. Donnelly argued the cause for respondents.

The opinion of the court was delivered by

HOFFMAN, J.A.D.

In this medical malpractice case, defendant Gary Frisoli, M.D. appeals from the denial of his motion for a new trial after a jury found him at fault for failing to diagnose fetal distress, which would have resulted in the earlier delivery of plaintiffs' daughter, Kylie.[1] Defendant argues the trial judge committed reversible error when she failed to declare a mistrial after his attorney became ill during the trial; on a related issue, defendant contends the judge erred "in failing to allow [him] to supplement the record concerning [his] trial counsel's impairment." Alternatively, defendant contends that errors in the jury

---

[1] In this opinion, we refer to Dr. Frisoli as defendant as he was the only remaining defendant at trial. Before trial, plaintiffs settled with the attending obstetrician, defendant Abu S. Alam, M.D. In addition, for ease of reference, we refer to plaintiffs and their children by their given names.

2

verdict sheet and other trial errors warrant reversal.  Following our review of the trial record and the parties' briefs, we affirm.

I

In 2006, Maria Tapia became pregnant with twins. At that time, she came under the care of Dr. Alam, who delivered her first child.  Because of the twin pregnancy, Dr. Alam, a general obstetrician, referred Maria to defendant, a maternal fetal medicine specialist, for prenatal testing, including fetal ultrasounds.

On December 8, 2006, defendant performed a routine anatomy scan at twenty weeks and four days gestation, which was within normal limits and showed both twins were concordant or growing equally.  On March 2, 2007, defendant evaluated the growth of the twins at thirty-two weeks gestation; at that time, he found a discordancy[2] in the weight of the twins, as the estimated

---

[2]  According to defendant, twins normally grow at the same rate during pregnancy.  "But if there's a difference [in weight] of [twenty] percent or more, most of us in maternal fetal medicine would consider that significant in terms of discordancy."  Plaintiffs' maternal fetal medicine expert, William Roberts, M.D., testified that when the difference in weight exceeds thirty percent, "that's considered severe fetal discordance."  Defendant testified his "calculation of the discordancy on [March 2] was [thirty-two] percent."

fetal weight (EFW) for Twin A[3] had decreased from the fiftieth percentile to the sixteenth percentile, while Twin B's EFW had increased from the fiftieth percentile to the sixty-sixth percentile. Defendant further noted that Twin A's abdomen was "significantly smaller" than Twin B's, "suggestive of asymmetric fetal growth restriction."

As a result of these findings, defendant performed a biophysical profile[4] (BPP), which was normal for both twins. He also performed umbilical artery Doppler studies to assess the blood flow of the placentas, and determined those studies were also within normal limits and reassuring. In a report faxed to Dr. Alam, defendant advised he wanted to see Maria again in two to three weeks for additional ultrasound scans and Doppler studies. In the meantime, he

---

[3] In prenatal testing, twins are referred to as "A" and "B." Here, Kylie was Twin A and her brother Aiden was Twin B. On March 2, the EFW for Twin A was 1489 grams and the EFW for Twin B was 2202 grams.

[4] According to defendant, a BPP involves assessing the "biophysical activities or characteristics of the baby," looking "at the fetal tone, fetal movement, the amniotic fluid volume, and fetal breathing." On the March 2 BPP, defendant scored "a two" for each item, "which is the most you can give. So the score of the [BPP] was eight out of eight."

4

recommended that Dr. Alam perform weekly non-stress tests[5] (NSTs) in his office.

The next BPP and Doppler studies were completed on Thursday, March 22, 2007, when defendant was not in his office. Svetlana Portnoy, a registered ultrasonographer, performed the studies in defendant's absence and did not note anything requiring immediate communication to a physician. Defendant reviewed the scans when he returned to the office on March 26. At that time, he observed continued discordancy between the twins; however, because Twin A had grown 500 grams since the last exam, and the BPP and Doppler studies were normal, he found the test results reassuring. Nevertheless, since the discordancy now demonstrated borderline growth restriction, defendant recommended in his report to Dr. Alam that Maria return in one week for follow-up scans, and in the interim, that Dr. Alam should perform NSTs "twice a week." Unbeknownst to defendant, Dr. Alam never followed his recommendation to perform NSTs, as Dr. Alam did not place any clinical value in NSTs when the BPP is normal.

---

[5] Defendant described the NST as "an independent test of fetal well-being . . . If it's reactive, it's an indication of . . . the brain's oxygenation." The test looks "at whether there are [fetal heartbeat] accelerations with fetal moment. If there are, the baby's test is reactive. If [there] are not, it's non-reactive."

When Maria returned to defendant on March 30, 2007, her Doppler studies were abnormal. According to defendant,

> [T]he Dopplers . . . showed me that now there was impedance or resistance of placental blood flow across the placenta to the baby. That was what caught my eye, the abnormal Dopplers. And that abnormal Doppler is what made me do a [NST] right [then] and there on her. And when I saw that the non-stress test was non-reactive, combined with the abnormal Doppler, that . . . precipitated my recommendation to have the baby delivered that day as soon as possible, as I felt that there was a significant change that I had not seen before.

Defendant recounted that he then "escorted Maria to labor and delivery," called the covering physician,[6] "explained to him the situation[,] and gave him my recommendations to have the patient delivered that day as soon as possible." The covering physician delivered the twins later that day. Plaintiffs contend this delivery should have occurred four days earlier, on March 26, when defendant reviewed the results of the March 22 testing. During those next four days, plaintiffs contend Kylie endured increasing hypoxia,[7] which caused her to sustain severe brain damage.

---

[6] Dr. Alam was on vacation.

[7] According to the National Institute of Neurological Disorders and Stroke, "Cerebral hypoxia refers to a condition in which there is a decrease of oxygen supply to the brain even though there is adequate blood flow." National

6

At trial, plaintiffs asserted that defendant's failure to timely diagnose and treat intrauterine growth restriction[8] (IUGR) resulted in a four-day delay of the twins' C-section delivery; a timely C-section would have prevented Kylie from sustaining permanent brain damage. Defendant denied all allegations of negligence and contended that a preexisting condition, gestational alloimmune liver disease[9] (GALD) – a condition that could not be diagnosed prior to delivery – caused Kylie's brain damage.

As argued by plaintiffs, and not challenged by defendant, both sides appear to agree on the following undisputed foundational facts:

- On March 30, 2008, for the third time, defendant performed the pre-birth surveillance test, BPP, which he was using to monitor the well-being of the twins.

- Defendant had special, extra training and was a maternal fetal medicine specialist, and because of that, he had been asked by Maria's regular

---

Institute of Health, Cerebral Hypoxia Information Page, https://www.ninds.nih.gov/disorders/all-disorders/cerebral-hypoxia-information-page (last visited Sept. 14, 2020).

[8] According to plaintiffs' neonatology expert, Marcus Hermansen, M.D., IUGR refers to a fetus or baby whose fetal weight is "less than the tenth percentile," or less than that of ninety percent of fetuses or babies of the same gestational age.

[9] Sarah Taylor, M.D., plaintiffs' pediatric liver disease expert, described GALD as a rare disease that onsets during pregnancy and occurs when the mother has an immune response that causes certain antibodies to cross the placenta and damage the developing liver of a fetus during gestation. According to Dr. Taylor, Kylie did not have GALD.

A-2611-18T1

obstetrician, Dr. Alam, who would normally deliver the twins, to periodically complete BPPs throughout this higher-risk twin pregnancy.

- On March 30, 2008, defendant saw Maria and did a series of tests, which revealed three abnormal results for Kylie, two from his BPP and one from an NST. Defendant considered the results "alarming." Those abnormal results were:

  a.) an estimated fetal weight for Kylie of less than the tenth percentile on the ultrasound component of the BPP;

  b.) a failing total score (four out of eight) on the BPP;

  c.) Kylie's fetal monitor tracing was "non-reactive," meaning the absence of heartbeat accelerations with fetal movement.

- As a result, defendant recommended a Caesarian section (C-section) delivery "as soon as possible."

- Notwithstanding the C-section delivery, Kylie sustained catastrophic injuries and remains blind, unable to talk, and confined to a wheelchair.

- Some growth discrepancy between the twins had been occurring for the last month of this pregnancy and had progressed to IUGR for Kylie on the March 22 BPP, which defendant's technician performed, and defendant read on March 26.

- Side-by-side growth charts and an immediate post-birth photo of the twins visually illustrated the extent of fetal growth discordancy between the twins.

According to plaintiffs, beyond these foundational facts, "both sides completely and diametrically disagreed on what reasonable inferences flowed from and must be accepted by the jury from those foundational facts as to both

8

what was required of [defendant] under the standard of care (negligence) and what caused Kylie's brain damage and when it occurred (causation)."

Plaintiffs' Experts

According to plaintiffs' experts, Kylie's IUGR was caused by nutritional placental insufficiency which was depressing her oxygen and would foreseeably progress to brain damage. Where there is IUGR, even a perfect BPP score is only good for four days. With IUGR, interim fetal surveillance was critically important, requiring defendant to urgently call Dr. Alam on March 26, 2008 and confirm that his NST results remained reassuring.[10] In fact, Kylie was suffering sub-acute distress from nutritional insufficiency that was causing her IUGR; by March 26, 2008, she had already begun suffering early – but still not permanent – brain damage from hypoxia. Thus, if done on March 26, 2008, plaintiffs' experts opined that Kylie's NST would have been nonreactive, requiring a

---

[10] On this point, the opinion of plaintiff's expert was supported by a guideline of the American Institute of Ultrasound in Medicine (AIUM), which required "important and unexpected" ultrasound results to be "directly" communicated "by the interpreting physician [to] the patient's health care provider. Communication by phone or in-person is preferred to allow verification of the receipt and discussion and should occur in a timely manner." Defendant and both parties' experts are AIUM members.

delivery on March 26 or 27, 2008, before she sustained permanent hypoxic oxygen-deprivation brain damage. Kylie did not suffer from GALD.

Defendant's Experts

According to defendant's experts, the IUGR on March 22 and 30, 2008, was barely below ten percent, was not significant, and did not cause any brain damage; instead, the brain damage was caused by GALD. Kylie's perfect eight out of eight BPP score on March 22, 2008, proved she had not suffered brain damage and was good for seven days. Although recommended by defendant at thirty-four weeks in this twin pregnancy, interim surveillance by NST was not required. Defendant's repeat of BPP in eight days on March 30, 2008, constituted good medical practice. Since Kylie had neither suffered brain damage in utero nor acute hypoxia at birth based on negative cord blood testing, nothing defendant did or failed to do was a substantial factor in causing her brain damage or increasing the risk of her sustaining such damage. Instead, defendant's experts opined that GALD caused Kylie's in utero IUGR and her post-birth liver failure, which led to multi-organ failure and two cardiac arrests on day-five to day-six of life, and that alone caused her brain damage.

Trial

Counsel for the parties delivered their opening statements on September 27, 2018. Over the next week, plaintiffs presented the testimony of almost all of their witnesses; however, before plaintiffs completed their case, defendant's designated trial counsel, Michael Keating (Mr. Keating), was hospitalized in a neurological intensive care unit, on the evening of Friday, October 5, 2018, with a diagnosis of ischemic stroke. Mr. Keating's condition was successfully treated, and he was discharged from the hospital on Sunday afternoon. Since the next day was a court holiday, Mr. Keating contacted the trial judge and plaintiffs' counsel to inform them of these developments.

On Tuesday, October 9, 2018, after three hours of in-chamber discussions, Mr. Keating requested a mistrial, stating, "My client doesn't feel comfortable with me continuing to represent him under the circumstances." However, Mr. Keating did not state he was medically unable to continue.

At the onset, the trial judge expressed her concerns regarding the fairest decision for all parties. She explained that plaintiffs had presented their entire case except for one remaining expert, the jury had invested two weeks of their time, and if she ordered a mistrial, defendant would gain an "unfair advantage."

The judge requested Mr. Keating provide "proof from a doctor, your neurologist . . . that you cannot go forward."

When the trial judge allowed defendant to state his reasons for wanting a mistrial on the record, he confirmed that one alternative to an immediate mistrial had already been discussed with him the day before: "In fact [Mr. Keating] expressed to me that one option was to request . . . a postponement of the trial for one week to see how and if he could get better." Nevertheless, defendant said he felt Mr. Keating "was now impaired," and expressed concern that he could "suffer another setback of the same type that he had Friday night during the remainder of the trial."[11]

After explaining to defendant that granting a mistrial is "the last resort," if there is no lesser way to "save all the work that's been done," the judge addressed Mr. Keating:

> Obviously[,] you were able to come to court today. You talked about having to go to court in another county. You spoke sensibly to me at length yesterday and sensibly at length today. . . . I see no measurable difference in you today than . . . the way you've been the last couple of weeks. But I'm not a doctor.

---

[11] The trial judge explained her reason for allowing defendant to address her directly, "I note Dr. Frisoli, when I passed through the courtroom, indicated to me that he would like to speak to me. And I . . . said that would be when we went on the record, he could address me."

In addition, Mr. Keating also had in court that day his pediatric neurology expert, David Mandelbaum, M.D., who came from Rhode Island.

Following an extensive discussion, the trial judge did not rule on defendant's request for a mistrial; instead, she adopted a "try and see" approach, first seeing if Mr. Keating wanted to present the testimony of Dr. Mandelbaum out of turn,[12] since he had come to court from out-of-state and was ready to testify. While emphasizing she did not "want to stress [Mr. Keating] unduly," the judge suggested Mr. Keating consider "starting [Dr.] Mandelbaum. It would be great because this jury has been sitting here all day and so has [Dr.] Mandelbaum. And . . . [you could] get his credentials and get his opinion[s] . . . ." Mr. Keating responded, "I don't know. I mean, if I'm told I have to do it, I have to do it." He then appeared to acknowledge the merit of starting Dr. Mandelbaum's testimony by stating, "You know, part of the problem is it's not easy to get these witnesses in[,]" and noting the "practical matter" that he comes "from Rhode Island."

The judge did not tell Mr. Keating he had to proceed with Dr. Mandelbaum; instead, after again noting that Dr. Mandelbaum had been there

---

[12] At that point, plaintiffs' counsel had already begun the testimony of his next-to-last witness, Kylie's father.

all morning, she replied, "So we could try to do that." Mr. Keating did not object to the judge's proposed plan. After lunch, Dr. Mandelbaum's entire testimony was completed, notwithstanding the judge's offer to stop after his qualifications, or at any other point, if Mr. Keating requested. Dr. Mandelbaum opined that GALD caused Kylie's brain damage and related injuries. In addition, he testified that in studies of children with similar injuries, "more than half will die by age [nineteen]" and "fewer than half will live to age [thirty]."

The next day, October 10, 2018, Russell Hewit (Mr. Hewit), a senior partner from Mr. Keating's law firm, appeared at trial, along with Mr. Keating. Mr. Hewit informed the judge that Mr. Keating had symptoms of a stroke and needed "one to three" weeks of recovery and "two to three" weeks without any stressful setting.[13] For these reasons, he renewed defendant's motion for a mistrial.

---

[13] Mr. Hewit did not present any supporting medical documentation at the time of his application. Just before noon, and after the judge ruled, Mr. Hewit presented a brief letter from John Hanna, M.D., the treating physician for Mr. Keating. After describing the successful treatment Mr. Keating received, Dr. Hanna provided the following assessment:

> While the prognosis for a full recovery for Mr. Keating
> is excellent and he is now functional and not in distress,
> he will not have fully recovered from the temporary
> ischemic trauma to his brain during the immediate

After extended discussions, both in chambers and on the record, the judge explained the need to explore lesser alternatives to a mistrial. Addressing Mr. Hewit, she stated,

> You've offered no solution, nothing that can change this, just give it a mistrial. You haven't even said to me, 'Judge can we do this in two weeks?'
>
> I believed Mr. Keating the minute he called me and none of this has to do with any disbelief of anything, any representation that he would make to me. It has to do with the draconian approach of after three weeks [–] all the time, effort and money spent, emotional cost, monetary costs, court time, everything [–] 'Judge, grant a mistrial, okay?'

At that point, the judge denied defendant's motion for a mistrial, without prejudice. Instead, after allowing plaintiffs' counsel to complete the testimony of Kylie's father (which took less than twenty-five minutes) and allowing plaintiffs' counsel to play the videotape testimony of his causation expert, the

---

> recovery period, generally one to three weeks assuming no further symptoms. For the next two to three weeks, Mr. Keating should not be in any stressful setting and should not participate in any trials in court.

A-2611-18T1

judge continued the trial until October 22[14] to allow time for Mr. Keating to rest and recover.[15]

After the trial judge confirmed she was denying defendant's mistrial application without prejudice, Mr. Hewit advised that "we will inquire of the doctors, if there is a reasonable time," if the case were adjourned "for a week or ten days, if that would make a difference and I will make that inquiry of the physicians." It appears that Mr. Hewit made this statement in response to the judge's suggestion of an extended postponement to allow Mr. Keating time to recover.[16]

The transcript for the afternoon of October 10, 2018 indicates the judge had a further, in-chambers discussion with trial counsel during the luncheon recess regarding Mr. Keating's condition. This occurred after Mr. Hewit

---

[14]  The judge later changed this date until October 23.

[15]  Notwithstanding this accommodation, because defendant's liability expert, Arnold Cohen, M.D., was leaving town before then, Mr. Keating requested his testimony be taken on Wednesday, October 17.

[16]  Notwithstanding this representation, neither Mr. Hewit nor Mr. Keating provided the judge with any further information from Mr. Keating's doctors before the jury returned its verdict. Nor did Mr. Keating inform the judge he was having any difficulty in completing the trial.

presented the report of Dr. Hanna.  Following that discussion, the judge announced the following plan:

> So here's what I've decided in consultation with Mr. Keating and [plaintiffs' counsel]. . . .  I'm going to ask this jury if they would come back in two weeks and I think - - I hope Mr. Keating would be better. . .
>
>    . . . .
>
> And I have come to this conclusion because of the frank discussion that I was able to have in chambers with Mr. Keating, who I know is frank and candid with me about what's going on and I respect that.

At that point, Mr. Keating presented the video of the de bene esse testimony of his causation expert, Joel Lavine, M.D., an expert in pediatric gastroenterology and pediatric liver diseases.  At the completion of the video, the trial judge explained to the jurors that due to "issues with availability," they would return in one week, on October 17, to hear the testimony of defendant's last expert, Dr. Cohen.  After that, they would return the following week, on October 23, to hear summations, receive jury instructions, and then deliberate.

Jury Charge and Verdict Sheet

Prior to charging the jury, the judge and trial counsel discussed the jury charges together and came to an agreement regarding how the judge would charge the jury.  They also worked together to tailor the jury verdict sheet to the

complex facts of this case. No objections were made to the charge or the verdict sheet.

Relevant to this appeal, the judge provided the following instruction, in pertinent part, regarding the verdict sheet:

> [W]e call this a <u>Scafidi</u>[17] charge. . . . So the first thing, when you're looking at the verdict sheet . . . [d]id the plaintiff prove by a preponderance of the credible evidence that the defendant, Dr. Frisoli, deviated from accepted standards of medical practice. You have a choice, and your answer is yes or no. . . . If yes, go to question [number two]. Did Dr. Frisoli's deviation from the accepted standard of medical practice increase the risk of harm posed by [Maria's] preexisting conditions? Okay and the answer is yes or no. That's the increased risk of harm, that <u>Scafidi</u> charge I was just talking to you about. If yes, go to question [number three]. Was the increased risk a substantial factor in producing the ultimate injury? Yes or no. But of course, if the answer is no, you cease deliberations and return your verdict.[18]

After deliberating, the jury returned an inconsistent verdict. Initially, the jury answered "yes" to question number one on the verdict sheet – that defendant

---

[17] <u>Scafidi v. Seiler</u>, 119 N.J. 93, 108 (1990) (holding that a modified standard of causation governs cases in which a defendant's alleged malpractice is deemed to have increased the risk of harm from a preexisting condition).

[18] In contrast to the judge's correct instruction, the jury verdict sheet mistakenly omitted the direction, "if the answer is no, . . . cease deliberations and return your verdict," that should have followed question three.

had deviated from the standard of care – and "yes" to question number two – that the deviation increased the risk of harm posed by the preexisting condition. However, the jury returned an inconsistent verdict, finding that neither the increased risk caused by defendant's negligence, nor the increased risk caused by Dr. Alam's negligence, was a substantial factor in producing Kylie's ultimate injury.

Under question number three,[19] the "substantial factor" question addressing defendant, the verdict sheet incorrectly advised the jury to proceed to question number four, without regard to whether the jury found defendant's deviation a substantial factor in causing plaintiffs' damages. Consistent with the jury verdict sheet instructions, the jury continued to deliberate, and proceeded to find both doctors liable, and awarded $20,000,000 in total damages. The jury found that sixty percent of Kylie's "ultimate injury" resulted from Dr. Alam's deviation from the standard of care and the remaining forty percent resulted from defendant's deviation from the standard of care.

When the jury foreperson reported the jury's responses to the questions on the verdict sheet, the error in the verdict sheet quickly became apparent to the

---

[19]  Question number six posed the "substantial factor" question regarding Dr. Alam's deviation from the standard of care. The jury answered that question "no" as well.

trial judge and counsel. The judge acknowledged that if the jury answered no to question number three, then the interrogatories should have instructed the jury to cease deliberations. The judge explained the inconsistency to the jury:

> I don't want to discuss your verdict with you, but you might remember that I told you . . . if the deviation was not a substantial factor in producing the ultimate injury, then you don't recover against Dr. Frisoli or against Dr. Alam if you found . . . the same findings for him, too. Did Dr. Alam's deviation increase the risk of harm posed by [Maria's] preexisting condition[?] ["]Yes, you said.["] Was the ultimate injury? ["]No[,] you said.["] So you didn't find the three predicates in order to say what portion of the ultimate injury is a result of [Dr.]Frisoli or a result of [Dr.] Alam, because you found that neither was a substantial factor, which would lead you to believe that you would come to a different conclusion. But then when we came down to[,'D]id Dr. Frisoli prove that some portion of Kylie Tapia's ultimate injury was a result of the . . . preexisting condition[?'], you said, ["N]o.["] So you would find that she didn't have any preexisting condition.

In response to the obvious confusion, the judge proceeded to reinstruct the jury on proximate cause. There were no objections to the judge's further instructions. The parties also agreed the judge would provide a corrected verdict sheet to the jurors that informed them to cease deliberation after question number three, if they found defendant was not a substantial factor in causing the ultimate injury.

After further deliberations, the jury returned a second verdict, changing its answers to questions three and six from "no" to "yes," indicating the deviations of defendant and Dr. Alam did constitute a substantial factor in producing Kylie's ultimate injury. The jury also returned a revised liability apportionment, increasing Dr. Alam's liability to seventy percent and reducing defendant's to thirty percent. The total amount of damages awarded remained unchanged at $20,000,000.

Post-Trial Motions

On November 13, 2018, Mr. Hewit filed two post-trial applications for defendant, a motion to supplement the record and a motion for a new trial. The trial judge denied both motions.

In the motion to supplement the record, defendant sought leave to admit an October 30 certification from Dr. Hanna and an undated certification from defendant. In his certification, Dr. Hanna described a follow-up neurological exam he completed on October 16, where Mr. Keating "presented with complaints of continuing numbness and tingling sensation." Dr. Hanna stated that while Mr. Keating "would appear functional, he was not functioning at his full capacity" and "would not be expected to be functioning at full intellectual capacity for another several weeks." He added that Mr. Keating should avoid

"any stressful setting and should not participate in any trials in court until after Thanksgiving . . . ." Dr. Hanna added that he scheduled Mr. Keating "for follow up in [six] months."

In his undated certification, defendant said he observed Mr. Keating on October 17, 23, and 24, and concluded he "was not functioning at his normal level[,] [he] was not as quick thinking, his speech was slow, his affect was flat, he would only speak in simple sentences, he could not move from one topic to another, was slower in grasping conversation and responding on conversation, and lacked energy." Defendant did not provide an explanation for not raising his concerns with the trial judge, as he did on October 9.

Mr. Keating also submitted a certification, stating he "continued to have symptoms, including numbing and tingling in [his] left arm and weakness on the left side of [his face], lack of energy, fatigue and inability to concentrate[,] which negatively affected [his] ability to prepare for trial . . . ." Mr. Keating did not provide an explanation for his failure to share this information with the trial judge.

Addressing the motion to supplement the record, the trial judge recalled receiving a call on Columbus Day from a retired judge urging her to speak with Mr. Keating:

> I spoke to [Mr. Keating] briefly. He told [me] what had happened. That he was out of the hospital. I said are you able to continue? He said I think I am but my client doesn't want me to. . . . The next day Mr. Keating was here. He indicated he was prepared to go forward. He went forward. He did his usual excellent job with the witness.
>
> The next day Mr. Hewit appeared [and] [a]sked for a mistrial.
>
>    . . . .
>
> We . . . were at a juncture in the case where . . . almost the entirety of the [plaintiffs'] case had been put in . . . [and] some of the defense case [was] in.
>
>    . . . .
>
> I spoke with Mr. Keating and [plaintiffs' counsel] in chambers, because I really wanted to hear from Mr. Keating himself. And all I needed was Mr. Keating to say I can't go forward . . . .

In addition, the judge recounted that, before Dr. Cohen testified on October 17, she checked to make sure that Mr. Keating was ready to proceed,

> When . . . we returned to [c]ourt [for] the last witness . . . eight days later[,] I came to [c]ourt not knowing what was going to happen that day. Whether . . . the application for a mistrial would be renewed, or whether Mr. Keating would tell me that he was worse, or not fee[l]ing well, or couldn't go forward. I had no idea, but I was prepared to listen to anything.
>
> And the first thing I said to Mr. Keating was, '[H]ow [are] you doing? He said okay. I said are we going

23

> forward? He said yes.[']  I saw [his] witness in the courtroom.
>
> So nobody had contacted me during that period of time to let me know that anything was wrong. . . .  It was not a fait accompli that we were going forward that day.  I didn't know what was going to happen.
>
> I was pleased and relieved to see that Mr. Keating was here, appearing well, and ready to go forward with his witness in the courtroom and so we did.  And he did an excellent job, as usual, in his direct examination of that witness.

The judge denied the motion to supplement the record, explaining "there is no basis to expand the record.  And to suggest that I should consider materials that were not available to me to say my decision to deny a mistrial on October 10th was incorrect . . . is wholly without merit."

Turning to the recharge, the judge explained that she had "the choice of trying to weed through whether or not [the jury] wanted to award [six] million to [plaintiff] and her family or whether they did not."  She believed it was clear the jury wanted to award a sum of money, but the jury was confused on the substantial factor questions.  She denied the motion for a new trial, explaining,

> I think the charge was accurate.  I think the decision I made was the only decision to be made and I handled it in consultation with experienced counsel, with their advice and consent in terms of what was to be charged when I sent them back in.  It was an intelligent jury. . . . And I think this is what they intended to do.  They

24

> intended to find [defendant] [thirty] percent responsible for Kylie's [] injuries and they intended to award the amount of money they awarded.

On January 31, 2019, the trial judge entered an Order for Judgment against defendant in the amount of $6,599,625.34. This figure consisted of $6,000,000 (defendant's thirty percent share of the $20 million damage award), plus his proportionate share of stipulated medical bills, prejudgment interest, and offer of judgment penalties.

This appeal followed. Defendant presents the following points of argument for our consideration:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S APPLICATIONS FOR A MISTRIAL DUE TO TRIAL COUNSEL'S MID-TRIAL STROKE, THEREBY DEPRIVING DR. FRISOLI OF HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL AND RESULTING IN A MANIFEST INJUSTICE TO HIM.

POINT II

THE TRIAL COURT ERRED IN FAILING TO ALLOW DEFENDANT TO SUPPLEMENT THE RECORD CONCERNING TRIAL COUNSEL'S IMPAIRMENT AND CONSEQUENTLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL, RESULTING IN A MISCARRIAGE OF JUSTICE.

POINT III

THE TRIAL COURT'S INITIAL JURY CHARGE, WHICH INCORPORATED AN ERRONEOUS VERDICT SHEET, WAS

IMPROPER AND CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT.

POINT IV

THE TRIAL COURT ERRED IN FAILING TO ACCEPT THE JURY'S FIRST VERDICT WHICH, BUT FOR THE ERRONEOUS VERDICT SHEET, WOULD HAVE RESULTED IN A JUDGMENT OF "NO CAUSE" OF ACTION IN FAVOR OF DEFENDANT.

POINT V

THE TRIAL COURT'S RE-CHARGE EMPHASIZED PLAINTIFF'S VERSION OF PROXIMATE CAUSE, IMPROPERLY SUGGESTED THE FIRST VERDICT WAS ERRONEOUS AND RESULTED IN A VERDICT THAT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT VI

THE TRIAL COURT IMPROPERLY EMPHASIZED PLAINTIFFS' VERSION OF LIFE EXPECTANCY AND DAMAGES, THEREBYRELIEVING THEM OF THEIR BURDEN OF PROVING REASONABLY PROBABLE FUTURE DAMAGES.

POINT VII

THE CUMULATIVE ERRORS OF THE TRIAL COURT DEPRIVED DEFENDANT A FAIR TRIAL AND WERE CLEARLY CAPABLE OF PRODUCING THIS UNJUST RESULT IN THE FORM OF A MULTIMILLION JUDGMENT AGAINST DEFENDANT.

We have considered these arguments after carefully reviewing the extensive trial record. Finding no basis to reverse the denial of defendant's post-trial motions, we affirm those rulings substantially for the reasons stated by

26

Judge Camille M. Kenny in the oral opinions she delivered on January 7 and 9, 2016. In addition, contrary to defendant's arguments, we conclude the judge did not err in failing to accept the jury's initial verdict, the liability verdict was not against the weight of the evidence, and the verdict was not a miscarriage of justice. See R. 4:37-2(b); R. 4:49-1(a); Dolson v. Anastasia, 55 N.J. 2, 5-7 (1969); Dolan v. Sea Transfer Corp., 398 N.J. Super. 313, 329-30 (App. Div. 2008). We further conclude that none of defendant's remaining arguments warrant disturbing the verdict.

## II

"New Jersey courts apply the substantial factor test in medical malpractice cases involving preexisting conditions." Reynolds v. Gonzalez, 172 N.J. 266, 280 (2002). There are three inquiries relevant to the liability of the defendant doctors in diagnosing and treating preexisting conditions: 1) whether one or more of defendants deviated from the standard of care in failing to diagnose or rendering treatment; 2) whether, within a reasonable degree of medical probability, their negligence increased the risk or lessened the chance of avoiding the harm threatened by the preexisting condition; and 3) whether the increased risk of or lost chance to avoid the harm posed was a substantial factor in bringing about the harm. See id. at 282-83, 287-88.

Where preexisting conditions are at issue, a defendant's deviation "need not be the only cause, nor a primary cause, to be a substantial factor in producing the ultimate result." Reynolds, 172 N.J. at 288. It is enough that it is a "substantial factor," one which is neither remote nor inconsequential and plays a "role that is both relevant and significant." Ibid.

In reviewing an order on a motion for a new trial, "[t]he trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. An appellate court must give due deference to the trial court's "feel of the case[,]" that is, its regard for "the jury to pass upon the credibility of the witnesses" and whether "it clearly and convincingly appears that there was a miscarriage of justice under the law." Carrino v. Novotny, 78 N.J. 355, 361 (1979) (quoting R. 4:49-1(a)); see also Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977); Dolson, 55 N.J. at 7 (holding that in reviewing the trial court's denial of a motion for a new trial, "the appellate court must give deference to the views of the trial judge . . . ."). Jury verdicts should be cast aside in favor of a new trial sparingly and only to prevent a clear injustice. Caicedo v. Caicedo, 439 N.J. Super. 615, 628-29 (App. Div. 2015).

"The grant of a mistrial is an extraordinary remedy that should be exercised only to prevent manifest injustice." Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013) (citing State v. Ribalta, 277 N.J. Super. 277, 291 (App. Div. 1994)). "An appellate court should not reverse a trial court's denial of a mistrial motion absent a clear showing . . . [of] actual harm or that the court otherwise abused its discretion." State v. Yough, 208 N.J. 385, 397 (2011) (internal quotations omitted).

III

We begin by addressing defendant's argument that the judge abused her discretion in denying his motions for a mistrial. He asserts the judge "underestimated Mr. Keating's neurological impairment, which was not obvious . . . to a lay person." Additionally, he argues the judge focused inordinate attention on other considerations, rather than his right to a fair trial.

In response to the mistrial motion defendant made on October 9, the judge took note of all the time, effort, and money already expended in this substantially tried case, and explained that granting a mistrial is "the last resort." She also appropriately noted that Mr. Keating was "able to come to court" and "talked about having to go to court in another county." She further recounted that Mr. Keating "spoke sensibly to me at length yesterday and sensibly at length today."

While acknowledging she is "not a doctor," she noted the absence of any medical documentation to support the application.

Based on the record before her, the judge reasonably exercised her discretion by deferring a formal decision on the mistrial application, particularly in the absence of any supporting medical documentation. Instead, the judge reasonably proceeded with a "try and see" approach, inquiring about the possibility of Mr. Keating presenting the testimony of his out-of-state liability expert, who was in court and ready to testify, and allowing plaintiffs to finish their case by completing the testimony of Kylie's father and playing a de bene esse videotape of their final expert. Mr. Keating did not object to the judge's proposed plan.

The next day, October 10, 2017, Mr. Hewit appeared – not in place of Mr. Keating, but with him – and made a second mistrial application. The judge did decide this motion and denied it, but without prejudice. In making this decision, the judge balanced numerous factors. She considered that plaintiffs had presented almost their entire case, which would involve significant costs to re-litigate, the jury had been at trial for two weeks, and a mistrial would provide defense counsel with an unfair advantage because they had an opportunity to

hear the testimony of plaintiffs' experts. The judge also noted the continued absence of any supporting evidence regarding Mr. Keating's medical condition.

After allowing plaintiffs to finish the testimony of one witness and present a final expert on video, the judge attempted to accommodate Mr. Keating's condition by delaying the trial for almost two weeks. Just before noon, Mr. Hewit presented a report from Dr. Hanna advising that Mr. Keating needed one to three weeks to recover. After receiving this report, and discussing the matter in chambers with trial counsel, the judge announced a two-week postponement of the trial, a postponement which fell within the two- to three-week time frame identified by Dr. Hanna. The judge explained that she came to her decision "because of the frank discussion" she had "in chambers with Mr. Keating." The judge was prepared to declare a mistrial if that result was indicated, as she later explained, "[A]ll I needed was Mr. Keating to say I can't go forward . . . ."

During the next two weeks, Mr. Keating presented no further documentation concerning his medical condition, nor did he advise the judge that he could not continue, or otherwise renew the mistrial motion. The judge concluded that putting the case off for two weeks, absent further information or

developments, was sufficient to preserve a fair trial, and her decision is entitled to deference.

We are satisfied the judge's decision to deny defendant's mistrial motion without prejudice did not amount to an abuse of discretion. State v. Jackson, 211 N.J. 394, 407 (2012). Defendant has not shown it would be "in the interests of justice" to reverse the judge's decision, based upon information that was not provided to her. R. 2:10-2. The record contains no credible explanation why the information contained in the certifications submitted by defendant in support of his post-trial motions was not made known to the trial judge before the trial continued with Dr. Cohen's testimony on October 17. The October 30 certification of Dr. Hanna was based on the October 16 office visit, where Mr. Keating "presented with complaints of continuing numbness and tingling sensation." These symptoms, and the results of a further examination of Mr. Keating, caused Dr. Hanna to conclude, "Mr. Keating should not be in any stressful setting and should not participate in any trials in court until after Thanksgiving . . . ."[20]

---

[20] Of note, Dr. Hanna's report lists no positive cognitive impairment findings on exam from either Mr. Keating's hospital admission or his October 16 office visit. In addition, our review of the record of October 9, 2018, and thereafter, did not reveal any difficulties encountered by Mr. Keating in defending the case.

If defendant had an objection to the trial continuing, that objection should have been made known to the trial judge, before Dr. Cohen's testimony, and certainly before summations. Instead, before Dr. Cohen's testimony, Mr. Keating assured the judge he was "okay" and ready to go forward. A party should not be permitted to take a chance on a verdict by one jury and then complain if the verdict is unfavorable. Lamanna v. Proformance Ins. Co., 364 N.J. Super. 473, 476 (App. Div. 2003), aff'd, 184 N.J. 214, 222-23 (2005). "'To do so would condone a tactic of . . . awaiting the outcome, and then raising the issue on appeal when the outcome is unfavorable.'" Id. at 477-78 (quoting Walder, Sondak, Berkeley, & Brogan v. Lipari, 300 N.J. Super. 67, 82 (App. Div. 1997)). Those concerns are heightened here, where the trial judge received direct confirmation from Mr. Keating that he was able and ready to proceed. Absent plain error, of which we find none, defendant is not entitled to relief from the consequences of chosen trial strategies. See T.L. v. Goldberg, 238 N.J. 218, 232 (2019).

Defendant further argues that Rule 4:25-4 applies to this case because, on Wednesday, October 9, the trial judge inquired as to whether another attorney in Mr. Keating's "very competent firm" might be able to complete the direct

testimony of Dr. Cohen, the only remaining defense witness at that point. After

Mr. Keating replied, "I don't think so," the judge did not raise the issue again.

R. 4:25-4 provides:

> Counsel shall, either in the first pleading or in a writing filed no later than ten days after the expiration of the discovery period, notify the court that designated counsel is to try the case, and set forth the name specifically. If there has been no such notification to the court, the right to designate trial counsel shall be deemed waived. No change in such designated counsel shall be made without leave of court if such change will interfere with the trial schedule . . .

The purpose of Rule 4:25-4 is to protect attorneys and their clients from trial courts compelling them to substitute a partner or associate for an unavailable attorney and to proceed to trial, even if the partner or associate was unfamiliar with the file or inexperienced in the area of practice. See Harmon Cove II Condo. Ass'n Inc. v. Hartz Mountain Indus., 258 N.J. Super. 519, 522 (1992) (granting an adjournment based on R. 4:25-4 where the designated trial attorney was committed to another trial).

Here, Mr. Keating was not unavailable because of another trial nor did the judge force another attorney from Mr. Keating's firm to continue the trial. After a two-week delay in the trial, Mr. Keating appeared and did not move for a mistrial, nor did he indicate any inability to complete the trial. Thus, we find

this argument clearly lacks substantive merit because the judge did not require another attorney to continue the case in place of Mr. Keating.

Defendant further argues the trial judge erred when she denied his motion to supplement the record with evidence regarding his ischemic stroke, which the judge should have considered when deciding his motion for a new trial. Defendant sought to admit an October 30 report from Dr. Hanna, based on a follow up evaluation performed on October 16, which indicated Mr. Keating continued to have physical symptoms. The updated report concluded that while Mr. Keating "would appear functional, he was not functioning at his full capacity" and "would not be expected to be functioning at full intellectual capacity for another several weeks." Defendant argues that Rule 4:49(a) and Rule 1:1-2 permit the supplementation of the record in this instance.

R. 4:49-1(a) provides:

> On a motion for a new trial in an action tried without a jury, the trial judge may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment. The trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law. (Emphasis added.)

35

Rule 1:1-2 provides that the Rules of Court "shall be construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." It further provides that, "[u]nless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice." Ibid. "[T]he relaxation provision [of Rule 1:1-2] should be sparingly resorted to, particularly when a reasonable interpretation of the complex of directly applicable rules meets the problem at hand." Pressler & Verniero, Current N.J. Court Rules, comment 2 to Rule 1:1-2 (2021). "Determining whether relaxation is appropriate . . . requires an examination and balancing of the interests that are at stake." State v. Williams, 184 N.J. 432, 443 (2004).

Defendant's argument pursuant to Rule 4:49-1(a) is misplaced because it applies to bench trials. Turning to Rule 1:1-2, we discern no basis for permitting a post-verdict supplementation of the trial record with information that could have been provided before the jury rendered its verdict. The trial judge made a rational decision based on the information she had at the time of the mistrial motions. She appropriately balanced all the interests at stake and came to a reasonable conclusion to continue the trial for two weeks, in the reasonable expectation that the postponement would fairly accommodate everyone's

interests. The judge appropriately considered the enormous expense involved if she granted a mistrial and the fact that defendant would gain an advantage by having seen essentially plaintiffs' entire case. The judge, who denied defendant's mistrial motion without prejudice, reasonably expected that she would be informed if Mr. Keating's condition did not allow him to complete the trial, after the extended postponement. We are satisfied that rejection of the requested relaxation of the rules did not create an injustice.

Defendant argues for the first time on appeal that the original jury charge "was improper and clearly capable of producing an unjust result." Additionally, defendant asserts the verdict sheet was improper based on "the absence of the instruction after question [number three] to cease deliberations if the jury found the increased risk of harm from Dr. Frisoli's deviation from the standard of care was not a substantial factor in producing the ultimate injury . . ." which would have resulted in a no cause.

When a defendant fails to object to a jury charge at trial, we review for plain error, and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Plain error, in the context of a jury charge, is "[l]egal impropriety in the charge prejudicially affecting the

substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).

When reviewing any claim of error relating to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error[,]" State v. Torres, 183 N.J. 554, 564 (2005), and the effect of any error must be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). These jury charges must provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Dubak v. Burdette Tomlin Mem'l Hosp., 233 N.J. Super. 441, 456 (App. Div. 1989) (quoting State v. Green, 86 N.J. 281, 287-88). However, an attorney's failure to object to jury instructions not only "gives rise to a presumption that he did not view [the charge] as prejudicial to his client's case[,]" State v. McGraw, 129 N.J. 68, 80 (1992), but is also "considered a waiver to object to the instruction on appeal." State v. Maloney, 216 N.J. 91, 104 (2013).

The record reflects the trial judge carefully tailored the Model Civil Jury Charges to the specific facts of the case. We discern no error or prejudice that resulted from the judge's instructions.

The judge and counsel created the jury verdict sheet, again tailored to the specific issues presented by the case. Unfortunately, at some point in working on the verdict sheet, the instruction that should have followed question three ("if the answer is no, . . . cease deliberations and return your verdict") was mistakenly omitted.

Notwithstanding the error in the jury verdict sheet, the judge instructed multiple times that if the jury found defendant was negligent and increased the risk of Kylie's brain damage, but that the impact of that increased risk was inconsequential and was not a substantial factor in causing that brain damage, then the jury should stop their deliberations and not apportion liability or award damages. The judge explained to the jury the two conflicting theories on causation and reviewed the Scafidi factors. Additionally, when the judge explained the verdict sheet to the jury, she did in fact advise the jury to stop after question number three if the jury found defendant was not a substantial factor in causing Kylie's injuries. Thus, since the jury returned a verdict with an

inconsistent result, due to the mistake on the initial verdict sheet, we find no error in the jury charge.

Defendant contends the trial judge committed error when she rejected the jury's initial verdict as inconsistent.  We disagree.  A jury's verdict may be considered inconsistent if "there is no ready, logical or practical manner" in which different parts of the verdict "can be reconciled."  JMB Enters. v. Atl. Emp'rs Ins. Co., 228 N.J. Super. 610, 616 (App. Div. 1988) (citations omitted). The record here fully supports the trial judge's determination that the jury's initial verdict constituted an inconsistent verdict.[21]

In Mahoney v. Podolnick, 168 N.J. 202 (2001), our Supreme Court reviewed a jury medical malpractice verdict against two defendant doctors. During trial, the jury found both defendants negligent and that their negligence was a proximate cause of the plaintiff's loss of chance.  Id. at 205.  The jury awarded the plaintiff $700,000 in damages and the defendant moved for a judgment notwithstanding the verdict or a new trial.  Ibid.  The trial judge

---

[21]  Once the jury rejected defendant's contention that GALD caused Kylie's injuries, and found that defendant and Dr. Alam were both negligent and that their negligence increased the risk of harm posed by Kylie's IUGR, then the jury had to accept plaintiffs' theory of the case – that non-stress testing was urgently indicated on March 26, and would have resulted in a C-section delivery before Kylie sustained permanent brain damage from hypoxia.

vacated the verdict. On the retrial, the jury entered a no cause verdict. The plaintiff's appealed, attempting to reinstate the first verdict. We upheld the trial court's initial verdict, but the Supreme Court reversed. Id. at 206.

At the conclusion of the first trial, the jury returned an inconsistent verdict. The jury answered no to the substantial factor proximate cause question, but apportioned a percentage to that defendant. Id. at 210-11. The trial judge compared the jury's no vote on question three with the apportionment of liability set forth in question number seven and told the jury:

> [T]here's an inconsistency in the verdict. In number seven you attributed a percentage to Dr. Podolnick, and if you remember I told you, if it's not in the instructions, not written in the instruction, that you could assess a percentage on that question only if you had answered yes to all three in each grouping, that is, one, two and three about Dr. Podolnick or four, five and six for Dr. Landset. So you allocated 15 percent to Dr. Podolnick on the one hand while--on the one hand by virtue of your answer to question number three you determined that Dr. Podolnick was not responsible for reducing Elaine Brown's increased life expectancy, but then on the other hand on seven B you allocated a percentage of responsibility for that, so those two are inconsistent, so you can't do it that way.

> [Id. at 211.]

The trial judge sent the jury back for further deliberations, instructing them either to eliminate the percentage assigned to that doctor or to reconsider

their finding with respect to whether that defendant was a substantial factor in causing the plaintiff's harm. As a result, the jury changed its response to the substantial factor question. The Supreme Court concluded,

> After being told that the jury verdict was inconsistent, the trial court instructed the jury that it either could change the allocation of percentages on question seven or, alternatively, change its answer to question three. The jury followed the court's instruction and returned with a new verdict that corrected the response to question three. Even though the jury's original verdict was inconsistent, the trial court appropriately reinstructed and resubmitted the questions to the jury "to assur[e] consistent answers accurately reflecting the jury's findings."
>
> Id. at 222 (quoting Roland v. Brunswick Corp., 215 N.J. Super. 240, 244 (App. Div. 1987)).

The Court emphasized that the jury was capable of following the trial judge's curative instructions and capable of continuing "deliberations anew after they have already engaged in deliberations . . . or to disregard prior determinations in readdressing issues." Ibid. (citation omitted). The Court found the trial judge remedied the inconsistency in the initial verdict sheet by sending the jury back to the jury room for further deliberations. Id. at 223.

In Dubak v. Burdette Tomlin Memorial Hosp., 233 N.J. Super. 441 (App. Div. 1989), the plaintiff sued a bar and its bouncers alleging they failed to prevent an assailant from attacking and killing his son in the bar's parking lot.

Id. at 444. The jury returned a verdict finding the defendant was not negligent, but also allocated thirty percent fault to the bar and the bouncers. Id. at 454. The trial judge explained the inconsistency to the jury and told them to return to the jury room to reconsider their position. The jury sent a note to the trial judge explaining what they believed to be inconsistency with the jury sheet. Id. at 455. The judge responded by asking whether the failure was a proximate cause of the decedent's injuries, and the jury responded yes. Ibid. As a result, the judge entered judgment against the defendants. Ibid. On review, we affirmed finding "no error in the procedure employed by the trial [judge] in its attempt to determine the basis of the apparent inconsistency in the jury's original findings." Id. at 455. We stated:

> We perceive no abuse of discretion here. Faced with the logical incongruity in the jury's original answers to interrogatories, the trial court was obliged to explain the difficulty and, upon proper supplemental instructions, to require it to reconsider its responses in light of the law. The court's inquiry and the supplemental instructions given were entirely appropriate.
>
> [Id. at 456. (internal citations omitted).]

Here, after conferring with the attorneys, the judge brought out the jurors, explained the inconsistency in their verdict, and asked them to retire and continue their deliberations. This procedure the judge employed – explaining

43

to the jurors the nature of the inconsistency in their verdict and instructing them to continue their deliberations – was clearly appropriate and consistent with both Mahoney and Dubak.

The trial judge believed that the jury intended to find for plaintiffs and concluded the jury was confused generally regarding the substantial factor question. She proposed adding language under question number three, that if the jury found defendant's conduct was not a substantial factor in causing Kylie's injury, the jury should cease deliberating. Both parties agreed with the amendment of the verdict sheet and that the change would address the inconsistent verdict. Thereafter, the judge explained the inconsistency to the jury and then recharged the jury on the applicable law that related to question number three on the verdict sheet. The jury returned its verdict by changing its answer to questions three and six and reduced defendant's liability apportionment from forty percent to thirty percent. We conclude the judge reconciled the inconsistencies by providing an appropriate supplemental charge and by submitting a revised verdict sheet.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

44

A-2611-18T1